IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KELLEY O'DONNELL, | : | CIVIL ACTION |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| MARIROSA LAMAS, et al., | : | NO. 09-3435 |
| Respondents. | : | |

## REPORT AND RECOMMENDATION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                    January 31, 2012

Before the Court for Report and Recommendation is the petition of Kelley S. O'Donnell (alternatively "O'Donnell" or "Petitioner") for the issuance of a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  O'Donnell, who is serving a life sentence following her state court conviction of first degree murder and other charges, asserts seven claims of ineffective assistance of counsel and one claim of a due process violation that she contends require that her convictions be vacated.  For the reasons set forth below, we conclude that the claims are without merit or are procedurally defaulted and therefore recommend that the petition be denied and dismissed.

## I.      PROCEDURAL OVERVIEW

Following a bench trial before the Honorable Paul F. Ribner of the Philadelphia Court of Common Pleas, O'Donnell was convicted on June 30, 1993 of one count of first-degree murder, criminal conspiracy, possessing an instrument of crime, robbery, theft, unauthorized use of an automobile, arson, risking a catastrophe, abuse of a corpse, forgery, and credit card fraud.  The convictions arose from the robbery, killing, and dismemberment of the body of Eleftherios Eleftheriou in the early morning hours of November 12, 1992, the taking and subsequent destruction

1

of his car, and the use of his credit card following his death.  O'Donnell was tried jointly with William Gribble, who was her boyfriend at the time of the incident and the father of one of her children.  He, too, was convicted of the same offenses.  In the penalty phase of the case, Judge Ribner found that the Commonwealth had proven the aggravating circumstance it advanced — that the killing took place in the course of a robbery — and that this circumstance outweighed the two mitigating circumstances offered by the defense.  Accordingly, he sentenced O'Donnell to death on July 1, 1993.  O'Donnell was represented at trial and sentencing by Steven Sigal, Esquire.

Following sentencing, new counsel, Tracey Brandeis, Esquire, filed various post-verdict motions.  At a hearing held on May 3, 1994, the defense presented what it characterized as after-discovered evidence bearing upon her convictions, including testimony from a neighbor, hospital records showing that O'Donnell was away from the crime scene for two hours in the early morning of November 12, and testimony from O'Donnell herself that her father, allegedly a wanted fugitive, killed the victim in a fit of passion upon discovering him in a compromising position with his daughter — a fact that O'Donnell testified she did not disclose earlier due to threats from her father.[1] Judge Ribner denied the motions on August 11, 1994.  Attorney Brandeis then filed Petitioner's direct appeal to the Pennsylvania Supreme Court, preparing the appellant brief and appearing for oral argument.  The Supreme Court, however, found her representation of Petitioner to be inadequate and, on July 31, 1996, gave O'Donnell an opportunity to obtain new counsel.  She retained Robert B.

---

[1] This theory regarding her father's alleged involvement is not one that O'Donnell advanced in any subsequent appeals or collateral review.  We observe that in his opinion explaining his denial of O'Donnell's post-verdict motions, Judge Ribner noted, *inter alia*, that "it is not likely that the defendant's wholly self-serving testimony as to Mr. O'Donnell's involvement in this killing would alone have been sufficient to produce a different verdict if introduced at trial, or to negate the aggravating factor at the penalty phase." *Commonwealth v. O'Donnell*, Nos. 2093-2014, Dec. Term 1992, slip opin. at 9-10 (Phila. Ct. Comm. Pl. June 8, 1995)  [Resp't Ex. D].

Dunham, Esquire, of the Center for Legal Education, Advocacy & Defense Assistance in September 1996.  The court permitted Attorney Dunham to file a new appellate brief, which he did on March 17, 1997 (Resp't Ex. F), in which he asserted a number of issues relating to both the guilt and penalty phases of trial, including several allegations of ineffectiveness of counsel relating to Attorney Sigal's representation of Petitioner.  The Pennsylvania Supreme Court ultimately agreed that O'Donnell had received an inadequate colloquy prior to waiving her right to a jury for the penalty phase.[2]  In a decision and order dated October 28, 1999, it vacated her death sentence but affirmed the conviction. *Commonwealth v. O'Donnell*, 740 A.2d 198 (Pa. 1999) [Resp't Ex. G].

As the matter was prepared beginning in 2000 for a new penalty phase, Petitioner was represented by Paul M. George, Esquire and Daniel Stevenson, Esquire, both from the Defender Association of Philadelphia.[3]  The Honorable William J. Mazzola  presided over the penalty phase conducted before a jury beginning on January 29, 2002.  The defense offered testimony, *inter alia*, of a hand surgeon concerning O'Donnell's capacity for using a hammer or saw and a forensic pathologist concerning the cause of death.  The jury found that the Commonwealth had not met its burden of proof as to the only aggravating circumstance advanced in support of a death sentence: that the killing of Eleftheriou was committed in the course of a robbery.  (N.T. 2/6/02 at 34.) Accordingly, O'Donnell was sentenced to a term of life imprisonment on the murder conviction on

---

[2] In light of the remand on the colloquy issue, the court did not purport to thoroughly address claims of ineffectiveness relating to Attorney Sigal's representation of Petitioner in the penalty phase.  It did, however, express in a footnote at the end of its opinion that it felt "compelled to note that the record raises serious doubts regarding counsel's effectiveness during the penalty phase of [O'Donnell's] trial" with respect to the preparation or development of mitigating evidence. *Commonwealth v. O'Donnell*, 740 A.2d 198, 214 n.13 (Pa. 1999) [Resp't Ex. G].

[3] It is not clear from the record when exactly Attorney Dunham's representation ceased and the Defender Association's began.

February 6, 2002 and re-sentenced on the remaining convictions on May 9, 2002. Attorneys George and Stevenson filed a post-sentence motion raising several claims of ineffective assistance of trial counsel concerning issues that had not been raised in O'Donnell's direct appeal by either Attorney Brandeis or Attorney Dunham. [Resp't Ex. H.] The trial court denied the motion on the grounds that it lacked jurisdiction to consider guilt phase claims where the Pennsylvania Supreme Court had already affirmed Petitioner's convictions in the earlier stage of the direct appeal.

Attorneys George and Stevenson filed a timely petition for collateral relief under Pennsylvania's Post Conviction Relief Act, 42 Pa. Cons. Stat. §§ 9541-46 (the "PCRA"), on October 17, 2002, raising several specific claims of ineffective assistance of Attorney Sigal as her trial counsel, as well as a claim of constructive denial of counsel due to Attorney Sigal's admitted drug addiction. The petition also alleged the ineffectiveness of Attorney Brandeis and Attorney Dunham in failing to raise these claims in the post-verdict motions and the appeal litigated before the Pennsylvania Supreme Court. [Resp't Ex. I.] Judge Mazzola, sitting as the PCRA Court, ultimately denied PCRA relief on all claims on May 8, 2007.[4]  *Commonwealth v. O'Donnell*, CP-51-CR-1220812-1992 (Phila. Ct. Comm. Pl. May 8, 2007) [St. Ct. Rec. Doc. D-18]. Attorney George, then

---

[4] The PCRA Court initially denied relief on all the specific claims of ineffectiveness but at the same time granted an evidentiary hearing on the general claim of ineffectiveness of trial counsel due to alleged drug use during the trial. *Commonwealth v. O'Donnell*, CP-51-CR-1220812-1992, (Phila. Ct. Comm. Pl. Nov. 21, 2005) [Resp't Ex. K]. The Commonwealth undertook an interlocutory appeal. The Superior Court reversed the grant of the evidentiary hearing on the grounds that O'Donnell's offer of proof was deficient in establishing that Attorney Sigal was actually using cocaine during the time of her trial, and because, even if she could demonstrate that Sigal took drugs during her trial, she was not entitled to PCRA relief because the PCRA Court had already rejected all of the claims based upon specific acts or omissions of Attorney Sigal. *Commonwealth v. O'Donnell*, 3111 EDA 2004 (Pa. Super. Ct. Apr. 24, 2007) [Resp't Ex. N].

4

in private practice,[5] appealed the PCRA Court's denial in May 2007.  The Superior Court affirmed, and the Pennsylvania Supreme Court denied further review.  *Commonwealth v. O'Donnell*, 1269 EDA 2007 (Pa. Super. Ct. Oct. 31, 2008) [Resp't Ex. R]; *Commonwealth v. O'Donnell*, 971 A.2d 492 (Pa. 2009) (table) [Resp't Ex. S].

Petitioner subsequently filed a timely, nominally *pro se* petition for the issuance of a writ of habeas corpus ("Pet.") (Doc. No. 1), including a lengthy brief ("Pet'r Br.") (Doc. No. 1) and accompanying exhibits ("Pet'r Ex.") with this Court, which were docketed on July 30, 2009. Respondent District Attorney of Philadelphia filed a response ("Resp.") (Doc. No. 17) and an appendix of exhibits ("Resp't Ex.") (Doc. No. 19).  On April 22, 2010, the Court granted Petitioner's request for the appointment of Attorney George as her counsel.  (Doc. Nos. 22, 23.)  On behalf of Petitioner, Attorney George filed a counseled reply to Respondents' brief ("Pet'r Reply") (Doc. No. 25) on June 15, 2010.  Respondents filed a reply to Petitioner's reply brief ("Resp't Reply") (Doc. Nos. 31, 32) on October 5, 2010.  After the matter was referred to the undersigned for preparation of a Report and Recommendation on November 29, 2010, this Court held oral argument on June 9, 2011.  (Doc. Nos. 34, 40.)

## II.   FACTUAL BACKGROUND

The Pennsylvania Supreme Court's opinion on direct appeal offers this summary of the factual background of the case:[6]

_____

[5]  The state court record indicates that Attorney George was privately appointed to represent O'Donnell on January 22, 2004, during the pendency of her PCRA petition in the PCRA Court.  [St. Ct. Rec. Doc. D-17.]

[6]  In her appeal marshaled by Attorney Dunham, O'Donnell did not challenge the sufficiency of the evidence to support her conviction, but the state high court was under an obligation in capital
(continued...)

[T]he evidence presented at trial establishes that in early November of 1992, Appellant and her boyfriend, William Gribble, were staying in an apartment at 3123 Richmond Street in Philadelphia. The apartment belonged to Agnes McClinchey, Gribble's mother,[7] who had given Appellant and Gribble permission to stay there while she went to visit [someone]. James Mathews, an elderly friend of McClinchey's, also resided in the apartment.

On November 11, 1992, at approximately 10:30 p.m., Appellant went to a pizza shop managed by Mr. Eleftheriou, carrying a leather jacket which she offered as collateral for a loan she sought from Mr. Eleftheriou. An employee of the pizza shop observed Mr. Eleftheriou remove a large roll of money from his pocket and give Appellant some money. Appellant and Mr. Eleftheriou then made arrangements to meet later that evening.  After closing the pizza shop at approximately 1:00 a.m. on November 12, 1992, Mr. Eleftheriou left in his car to meet Appellant.

In a confession later given to police, and admitted at trial, Appellant stated that at approximately 1:30 a.m. on November 12, 1992, she met with Mr. Eleftheriou and brought him back to the apartment at 3123 Richmond Street.  When Mr. Eleftheriou was looking out a window, Appellant admitted that she struck him in the head with a hammer.  After Mr. Eleftheriou fell to the floor, Appellant stated that she continued to beat him with the hammer.  Appellant claimed that she was motivated to kill Mr. Eleftheriou because he was a "pervert" and had previously sexually assaulted her.  Shortly after beating him,

---

[6](...continued)
cases such as hers to review the record to determine whether the Commonwealth had established the elements necessary to sustain a conviction for first-degree murder.  *See Commonwealth v. O'Donnell*, 740 A.2d 198, 201 (Pa. 1999) (citations omitted).  In conducting such an inquiry, the court was to view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the Commonwealth as verdict winner and was tasked with determining whether the fact-finder could find every element of the crime beyond a reasonable doubt.  *Id.*  The summary provided by the court was informed by this standard.  *See id.* ("Viewed under this standard, the evidence presented at trial establishes . . .").

[7] It appears that the assumption that Gribble was McClinchey's son might have resulted from misreading of the trial testimony in which McClinchey indicated that she lived in the apartment with "my son, William Gribble and Giny Gribble [O'Donnell] and myself and James Matthews."  (N.T. 6/29/93 at 406.)  She also testified that she had only known Gribble and O'Donnell for a "couple of months."  (N.T. 6/29/93 at 418.)

Appellant stated that she took Mr. Eleftheriou's body to the basement, dismembered the body with a hacksaw, and put the body parts in trash bags. She also admitted that she cut off Mr. Eleftheriou's penis and placed it in a pencil case with the intention of sending it to her father. In her statement, Appellant alleged that she beat and dismembered Mr. Eleftheriou without Gribble's help or knowledge. However, Appellant maintained that Gribble did help her with disposing the trash bags containing the body parts and stated that she and Gribble dumped the trash bags along Delaware Avenue at some point on November 12, 1992. Later that same evening, Appellant admitted that she and Gribble used Mr. Eleftheriou's car and credit card to go shopping.[FN2]

[FN2. After his arrest, Gribble also confessed to the murder of Mr. Eleftheriou. Gribble's version of the murder, however, differed from Appellant's. In his statement, which was also admitted at trial, Gribble claimed that he arrived at the apartment at approximately 2:00 a.m. and saw Eleftheriou and Appellant on the couch together. Gribble stated that Eleftheriou was "feeling [Appellant] all over." In response, Gribble stated that he hit Mr. Eleftheriou on the head with a hammer about ten to fifteen times. Gribble claimed that Appellant left the house and Gribble dismembered the body. According to Gribble's statement, he bagged the body parts and eventually dumped some of the bagged body parts along Delaware Avenue.]

On the morning of November 13, 1992, Philadelphia police received a report that someone had found body parts in a trash dump on North Delaware Avenue. The responding officers found the severed arms of a white male, a human torso with its head missing and a head with the left eye removed. These body parts were later identified as belonging to Mr. Eleftheriou. Among papers strewn around the site, police found a letter addressed to Agnes McClinchey, 3123 Richmond Street.

Later on November 13, 1992, Agnes McClinchey returned to her apartment, finding blood on her front door and on the carpet. Appellant told Ms. McClinchey that she and Gribble had "been involved in a murder" and that she had heard a report that the victim's head had been found on Delaware Avenue. Ms. McClinchey also overheard Appellant tell Gribble to burn Mr. Eleftheriou's car. When Gribble returned from doing so, Appellant said to him "thank God you didn't get caught." At approximately 7:30 p.m. on November 13, 1992, police responded to a report of a car on fire on D Street. After

the fire was extinguished, police found body parts in the inside of the car, later identified as belonging to Mr. Eleftheriou.

Ms. McClinchey subsequently called the police. After interviewing Ms. McClinchey at a near-by gas station, police went to her apartment and arrested Appellant and Gribble at approximately 1:30 a.m. on the morning of November 14, 1992. A search of the basement revealed a kitchen knife, a chisel, and a claw hammer, each containing traces of human tissue and blood. Stuffed inside a pipe, police also found a pencil case containing a human eyeball and penis. During questioning at the police station, Appellant and Gribble each gave their separate statements accepting personal responsibility for the murder while attempting to exculpate the other. Appellant and Gribble were each charged with murder, robbery, arson, and a variety of related offenses in connection with the killing of Mr. Eleftheriou.

Appellant and Gribble were tried jointly. Both waived their right to a jury trial and agreed to be tried before the trial judge. At the bench trial, an assistant medical examiner testified that there were numerous abrasions on Mr. Eleftheriou's head that were consistent with blows from a hammer. He further testified that one person could not have killed and dismembered the victim in a manner consistent with the physical evidence. According to the medical examiner, red abrasions in the areas where the victim's head and right arm had been severed indicated that his heart was still beating when these body parts were removed. In contrast, yellow abrasions in the areas where the remaining body parts had been severed indicated that the victim's heart had stopped beating by the time those parts were severed. The medical examiner testified that one person working alone would not have been able to remove both the head and the right arm in the estimated fifteen minutes it took before the victim bled to death. After hearing the evidence presented at trial, the trial judge convicted Appellant on all counts, including murder in the first degree, 18 Pa.C.S. § 2502(a).[FN3]

[FN3. Appellant was also convicted of criminal conspiracy, 18 Pa.C.S. § 903; possessing an instrument of crime, 18 Pa.C.S. § 907(a); robbery, 18 Pa.C.S. § 3701; theft by unlawful taking, 18 Pa.C.S. § 3921; unauthorized use of an automobile, 18 Pa.C.S. § 3928; arson, 18 Pa.C.S. § 3301; risking a catastrophe, 18 Pa.C.S. § 3302(b); forgery, 18 Pa.C.S. § 4101; abuse of a corpse, 18 Pa.C.S. § 5510; and credit card fraud, 18 Pa.C.S. § 4106.]

*Commonwealth v. O'Donnell,* 740 A.2d 198, 201-03 (Pa. 1999) (citations omitted).[8]

In addition, with respect to the record as to trial counsel's representation of O'Donnell, we note that Attorney Sigal moved to suppress O'Donnell's confession on the grounds that it was not voluntary in light of her alleged drug use and because she had suffered a seizure the night before her arrest and received medication that allegedly interacted with the narcotics she had taken.  The

---

[8]  Applying these facts to the question of the sufficiency of the evidence supporting that conviction, the court noted:

> We agree with the trial court that the evidence presented at trial was sufficient to support a conviction of first degree murder.  Using a hammer to repeatedly smash a human being's skull undoubtedly supports a finding that a deadly weapon was used on a vital part of the victim's body and permits an inference of a specific intent to kill. Further, based upon our independent review of the record, we are satisfied that sufficient evidence was produced at trial from which the fact finder could have found each element of an intentional killing beyond a reasonable doubt. [FN4]

> [FN4. Although Gribble stated in his confession that he beat and dismembered Mr. Eleftheriou, and Appellant claimed in her confession that she had committed these acts, the record sufficiently supports the trial court's finding that both Appellant and Gribble participated in robbing, beating and dismembering Mr. Eleftheriou. The trial court found that it had been presented with sufficient evidence of a premeditated plan to lure Mr. Eleftheriou to the apartment, to rob him and to murder him by smashing his skull with a hammer.  First, Appellant noticed that Mr. Eleftheriou was carrying a large roll of cash while at Mr. Eleftheriou's store on the evening of the murder. Testimony from Ms. McClinchey revealed that the tools, determined to be the murder weapons, were normally kept in the basement.  Since the hammer was already in the living room when Mr. Eleftheriou was first attacked with it, the trial court concluded that this fact supported the Commonwealth's theory that the tools had been placed in the living room in anticipation of the attack upon Mr. Eleftheriou.  Moreover, the medical examiner testified that, given the physical evidence, the dismemberment of Mr. Eleftheriou's body would have required more than one person.  Further, following the killing, Gribble and Appellant stole and used Mr. Eleftheriou's credit card to purchase some items.  Viewed in the light most favorable to the Commonwealth, this evidence is sufficient to support the inference that Gribble and O'Donnell formed a premeditated plan to rob and kill Mr. Eleftheriou.  *Accord Commonwealth v. Gribble*, 550 Pa. 62, 73-75, 703 A.2d 426, 432 (1997).]

*O'Donnell,* 740 A.2d at 203 (citations omitted).

Honorable Joseph D. O'Keefe, sitting as the suppression court, explicitly found O'Donnell not credible and denied the motion. *See* N.T. 6/15/93 at 98-99.  At trial, Attorney Sigal attempted to win an acquittal under the theory that O'Donnell was at most merely present when Eleftheriou was in the apartment where she and Gribble were staying and that it was Gribble alone who had attacked and dismembered Eleftheriou.  Both Attorney Sigal and Attorney Mirachi, representing Gribble, further argued that it would not have made sense for the defendants to plan to rob, and then have to murder, Eleftheriou because he had served as a "golden goose," paying O'Donnell for various items to pawn, and keeping the couple supplied with money for their drug habit.  Attorney Sigal also argued that someone with O'Donnell's obviously disfigured hands — the appearance of which witnesses testified to — could not have perpetrated a crime involving the submission of a man as large as Eleftheriou and used rudimentary hand tools to cut through flesh and bones.  He also established that O'Donnell was transported from the location of the murder by medics at 3:00 a.m. in response to a 911 call and for evaluation of an alleged seizure.[9]

## III.    DISCUSSION

O'Donnell requests habeas relief on eight grounds: (1) that she was deprived of her Sixth Amendment right to the effective assistance of counsel when Attorney Sigal did not present at trial the tape of her 911 call and the testimony of her upstairs neighbor, Joseph Boles, who also called 911 about what he heard coming from the ground floor apartment, and that her appellate attorneys were ineffective for not presenting this claim on direct appeal; (2) that Sigal was ineffective for not presenting evidence of her hospitalization during the time that the victim's body was arguably

---

[9]   The Commonwealth introduced evidence that Eleftheriou left his pizza shop in his car around 1:20 a.m. with the leather jacket that O'Donnell had given him earlier in the evening.  *See* N.T. 6/16/93 at 75-76.

dismembered, and that her appellate attorneys were ineffective for not presenting this claim on direct appeal; (3) that Sigal was ineffective for not presenting evidence to rebut and discredit the testimony of Ada Vega, Eleftheriou's employee, which had supported the Commonwealth's theory that O'Donnell set out to rob the victim, and that O'Donnell's appellate counsels were ineffective for not presenting this claim on direct appeal; (4) that she was constructively denied her Sixth Amendment right to counsel due to Sigal's cocaine addiction, and that appellate counsel was ineffective for not raising this claim; (5) that Sigal was ineffective for not presenting expert testimony to "debunk" the medical examiner's conclusion that more than one person was involved in the dismemberment, and that appellate counsel was ineffective for not raising this claim; (6) that Sigal was ineffective for not presenting expert testimony that O'Donnell suffered from a physical disability of her hands that rendered her incapable of committing actions attributed to her (i.e., moving and/or dismembering Eleftheriou's body), and that appellate counsel was ineffective for not presenting this claim; (7) that the cumulative effect of the individual instances of Sigal's ineffectiveness at trial was itself a deprivation of her right to the effective assistance of counsel; and (8) that her due process rights guaranteed under the Sixth and Fourteenth Amendments were violated when the trial court allegedly refused to consider, as evidence of O'Donnell's innocence of the murder charge, Gribble's statement confessing that he alone killed Eleftheriou and that he did so while in a jealous rage. *See, e.g.,* Pet'r Br. at *i-iv* (Table of Contents).

Respondents contend that five of Petitioner's eight claims are procedurally defaulted and cannot provide the basis for habeas relief. Of those five claims, Respondents assert that three of O'Donnell's claims of ineffective assistance of counsel were waived in state court due to improper pleading on PCRA review. They also assert that the ineffectiveness claim concerning the alleged

cumulative impact of Attorney Sigal's performance was defaulted due to O'Donnell's failure to have attempted to present this claim in any manner to the state courts. In addition, they contend that the claim that O'Donnell's due process rights were violated when the trial court refused to consider Gribble's confession was waived due to a lack of a contemporaneous objection by counsel at trial. Respondents also assert that the state courts' alternative holdings on the merits of the various allegedly defaulted claims — as well as the three remaining claims not alleged to be defaulted — did not involve an unreasonable application of any constitutional principles recognized by the United States Supreme Court and that they therefore do not give rise to federal habeas relief. Petitioner argues in her reply that the three ineffectiveness claims that were found to be defaulted by the state court pursuant to *Commonwealth v. McGill*, 832 A.2d 1014 (Pa. 2003), should not have been held to be waived and that, in any event, the state court's finding should not preclude habeas review on the merits because the *McGill* rule was not an adequate basis to support the state law judgment.

Before addressing the individual claims, we briefly set forth the standards that must govern our review of habeas petitions generally and of claims of ineffective assistance of counsel specifically, as that theory accounts for all but one of the claims for relief asserted by Petitioner here.

### A. Standards for the issuance of a writ of habeas corpus

In cases where the claim presented in a federal habeas petition was adjudicated on the merits in the state courts, the federal court may not grant habeas relief unless the state court adjudication —

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

12

28 U.S.C. § 2254(d).

The Supreme Court has made it clear that a habeas writ may issue under the "contrary to" clause of Section 2254(d)(1) only if the "state court applies a rule different from the governing rule set forth in [United States Supreme Court] cases or if [the state court] decides a case differently than [the United States Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A writ may issue under the "unreasonable application" clause only where there has been a correct identification of a legal principle from the Supreme Court but the state court "unreasonably applies it to the facts of the particular case." *Id.* This requires the petitioner to demonstrate that the state court's analysis was "objectively unreasonable." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002). In addition, this standard obligates the federal courts to presume that the "state courts know and follow the law" and precludes the federal court from determining the result of the case without according all proper deference to the state court's prior determinations. *Id.* at 24.

### B.    Procedural default

It is further the case that a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To do so, a petitioner must "fairly present" all federal claims to the highest state court before bringing them in federal court — a requirement that ensures that state courts have "an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights." *Duckworth v. Serrano,* 454 U.S. 1, 3 (1981). Even when a petitioner properly exhausts a claim, however, a federal court may not review it on the merits if a state court's denial of relief rests on a violation of a state procedural rule. *See, e.g., Johnson v. Pinchak,* 392 F.3d 551, 556 (3d Cir. 2004). This procedural bar applies only when the state rule is independent of the federal question presented

13

and adequate to support the judgment.  *See Gray v. Netherland,* 518 U.S. 152 (1996); *Coleman v. Thompson,* 501 U.S. 722 (1991).  A state rule is "adequate" for procedural default purposes if it was "firmly established, readily ascertainable, and regularly followed at the time of the purported default."  *Szuchon v. Lehman,* 273 F.3d 299, 327 (3d Cir. 2001).  These requirements ensure that "federal review is not barred unless a habeas petitioner had fair notice of the need to follow the state procedural rule," and that review is foreclosed by "what may honestly be called 'rules' ... of general applicability[,] rather than by whim or prejudice against a claim or claimant."  *Bronshtein v. Horn,* 404 F.3d 700, 707 (3d Cir. 2005).

If a federal court determines that a claim has been defaulted, it may excuse the default to grant relief only upon a showing of "cause and prejudice" or a "fundamental miscarriage of justice." *Lines v. Larkins,* 208 F.3d 153, 166 (3d Cir. 2000).  To satisfy the first reason for excuse, the petitioner must show some objective factor external to the defense that impeded efforts to comply with the procedural rule," as well as prejudice.  *Murray v. Carrier,* 477 U.S. 478, 488 (1986).  To satisfy the miscarriage of justice exception, the petitioner must typically show "actual innocence." *Cristin v. Brennan,* 281 F.3d 404, 420 (3d Cir. 2002).

### C.    Standards for claims of ineffective assistance of counsel

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test to evaluate claims of ineffective assistance of counsel in violation of the Sixth Amendment.  Under *Strickland*, counsel is presumed to have acted reasonably and effectively unless the petitioner can demonstrate both that "counsel's representation fell below an objective standard of reasonableness" and that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 686-88, 693-

14

94.   Applying the *Strickland* standard, the federal Courts of Appeals consistently have held that counsel cannot be held ineffective for failing to raise a meritless claim.  *See, e.g., United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999); *United States v. Kimler*, 167 F.3d 889 (5th Cir. 1999).

We note also that the Supreme Court has recognized that one of the duties of appellate counsel is to select which claims are most likely to obtain relief for their clients based upon the state of the law at that time, even if this means not presenting claims that might be meritorious if a higher court reconsiders a prior holding or repudiates an established state rule.  *See, e.g., Smith v. Murray*, 477 U.S. 527, 535-36 (1986) (noting, in a case where counsel presented 13 claims on direct appeal but not a claim upon which his client later sought habeas relief, that counsel's process of "winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy").  *See also Buehl v. Vaughn*, 166 F.3d 163, 174 (3d Cir. 1999) (noting that "[o]ne element of effective appellate strategy is the exercise of reasonable selectivity in deciding which arguments to raise"); *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996) (observing that counsel has "no duty to raise every possible claim" on appeal, that "[a]n exercise of professional judgment is required," and that "[a]ppealing losing issues runs the risk of burying good arguments ... in a verbal mound made up of strong and weak contentions") (citations and quotations omitted).

When the Pennsylvnaia Superior Court has addressed a claim on the merits, our analysis must be guided by the deferential standard of review provided for in § 2254(d).  As the *Strickland* standard itself is a "general standard," and the Supreme Court recognizes that a state court "has even more latitude to reasonably determine that a defendant has not satisfied that standard," our review of a state court decision on the merits of an ineffectiveness claim is "doubly deferential."  *Knowles v.*

15

*Mirzayance*, 556 U.S. 111, 123 (2009).  In these circumstances, we "take a highly deferential look at counsel's performance, *Strickland, supra*, at 689, through the deferential lens of § 2254(d), *Mirazayance, supra*, at n.2."  *Cullen v. Pinholster*, --- U.S. ---, 131 S.Ct. 1388, 1403 (2011).

> **D.    Respondents' assertion that Petitioner's first three claims are procedurally defaulted due to Petitioner's alleged non-compliance with the requirements of *Commonwealth v. McGill***

The parties disagree strongly on the question of whether certain claims asserted in O'Donnell's federal petition have been procedurally defaulted in that the state court found them to have not been properly presented to it and therefore waived.  The divergence in the interpretations is most acute with regard to the first three ineffective assistance claims in O'Donnell's habeas petition: on PCRA review, the Superior Court found these claims to have been waived due to inadequate presentation in O'Donnell's PCRA appellate brief in November 2007.  The dispute as to whether O'Donnell, who was represented by counsel at all relevant times, fairly presented these ineffectiveness claims to the state court in compliance with *Commonwealth v. McGill*, 832 A.2d 1014 (Pa. 2003), consumed a significant portion of the parties' briefing before this Court.[10]  *See, e.g.,*

---

[10]  *McGill* applied to only a limited set of cases due to evolving interpretations by state courts of pleading requirements for claims of ineffective assistance of counsel.  Before the Pennsylvania Supreme Court's decision in *Commonwealth v. Grant*, 813 A.2d 726 (Pa. 2002), claims of ineffective assistance of counsel were waived if not presented on direct appeal.  *Grant* changed the rule going forward, holding that claims of ineffective assistance of counsel presented for the first time in a PCRA petition would not be deemed waived.  *Grant*, 813 A.2d at 738.  The following year in *McGill*, however, the court clarified the rules with respect to cases where the direct appeal process with new counsel had already concluded and the petitioner sought to bring additional claims of ineffective assistance relating to trial counsel's performance.  The court determined that to preserve a claim that trial counsel was ineffective that had not been raised on direct appeal when it could have been, the petitioner had to plead and prove, in his PCRA petition, that *appellate* counsel was ineffective for failing to allege that trial counsel was ineffective, and to present argument on and "develop" the deficient performance and prejudice prongs as to each layer of ineffectiveness alleged.  "[T]hen, and only then, can the court proceed to determine whether the petitioner has proved his

(continued...)

Resp. at 13-18; Pet'r Reply at 4-33; Resp. to Pet'r Reply at 37-65.  The question of the "adequacy" of the *McGill* rule is one that appears to divide courts.  *See, e.g., Lewis v. Tennis*, Civ. A. No. 08-4498, 2010 WL 1946942, *4-*5 (E.D. Pa. May 12, 2010) (magistrate judge determined that state appellate court's finding of waiver due to improper layering reflected denial of relief based upon independent and adequate state bar, but district judge, citing cases, found state court violation of rules of criminal procedure rendered the state court's invocation of the *McGill* pleading rule "not an independent and adequate state bar").

We do not find it prudent to tarry on the *McGill* issue here, although we note that the petitioner in at least one of the cases where *McGill* was found not to represent an adequate bar was proceeding *pro se* in his PCRA appeal.  Here, of course, O'Donnell was represented by experienced counsel at all stages of her PCRA litigation, including at the time her appellate brief was filed in 2007, several years after the *McGill* requirements were laid out in 2003.  Our decision not to wade into the question of the application of *McGill* here is also influenced by the fact that, as to all three of the *Strickland* claims that Respondents contend were procedurally defaulted due to *McGill*, the Superior Court nonetheless provided an alternative basis to deny relief on those claims on the merits.  Accordingly, assuming without deciding that the state court's finding of waiver due to alleged non-compliance with *McGill* did not reflect reliance on a state court rule that was adequate to bar federal habeas relief, we will look to whether the Superior Court's determination that O'Donnell did not experience a deprivation of her Sixth Amendment right to counsel reflected an unreasonable application of the United States Supreme Court's *Strickland* jurisprudence.

---

[10](...continued)
layered claim."  *Commonwealth v. McGill*, 832 A.2d 1014, 1022 (Pa. 2003).

### E.       Analysis of all claims

We proceed to address each of the claims presented in O'Donnell's habeas petition, in the

order in which she presented them.[11]  Save for one claim raised by Petitioner, her seventh, which was

never presented to the state courts as a ground for relief, we address below the merits of each of her

claims, mindful at all times of the principles of comity reflected in the Supreme Court's

jurisprudence and codified in 28 U.S.C. § 2254(d).

### 1.       Ineffective assistance of counsel claim concerning the failure to introduce 911 tapes and the testimony of neighbor Joe Boles

Petitioner's first claim is that she was deprived of the effective assistance of post-conviction

and direct appeal counsel when they failed to present a claim of ineffective assistance of trial counsel

relating to the failure to introduce at trial tapes of two 911 calls and testimony of a neighbor that she

contends would have fixed the time of the murder and proven that she was not involved.  (Pet'r Br.

at 37-50.)  She asserts that these failures reflect deficient performance on the part of Attorney Sigal,

that there was no reasonable strategic basis for counsel's inaction, and that but for trial counsel's

omissions, there was a reasonable probability that the outcome of the guilt phase would have been

different.  She further asserts that neither Attorney Brandeis nor Attorney Dunham had a reasonable

strategic basis for failing to raise trial counsel's ineffectiveness in this regard when they represented

her between 1994 and 1997 because these claims were meritorious.  She also contends that this

---

[11]  While O'Donnell was nominally *pro se* at the time she filed her federal habeas petition, her submission reflects the assistance of counsel, specifically, Attorney George.  Following the Court's granting of Petitioner's motion for the appointment of counsel, in which she specifically requested that Attorney George be appointed to represent her, counsel did not seek to amend the petition in any way.  Therefore, the original filing in this case, Doc. No. 1, comprised of both the *pro se* habeas form petition as well as an accompanying brief, fully set forth the parameters of the claims we consider.

omission could not be considered the result of any strategic decision, particularly as to Brandeis, whose advocacy on appeal was found to be so lacking.  (Pet'r Br. at 37-46.)  She also attacks the Superior Court decision on this issue as "contrary to" and an "unreasonabl[e] application" of *Strickland*.  (Pet'r Br. at 46-50.)

Both the PCRA Court and the Superior Court addressed the basis for this claim at length. Petitioner hoped to use the audio tapes to place the time of death closer to 2:57 a.m. and to undermine the Commonwealth's theory that she engaged in a premeditated plan to rob and murder Eleftheriou in the apartment.[12]  With respect to additional evidence that neighbor Joe Boles could have presented, she points to testimony that Boles offered at a hearing on post-trial motions in 1994, when Petitioner was represented by Attorney Brandeis, that he heard the woman downstairs screaming "stop that, Daddy."  She contends that his testimony, had Sigal elicited it at trial, would have conveyed the sense that the woman, *i.e.*, Petitioner, was pleading with someone to stop and that this would have undermined the Commonwealth's contention that she conspired with Gribble to beat and then dismember Eleftheriou.  *See Commonwealth v. O'Donnell*, CP-51-CR-220812-1992, slip opin. at 10-11 (Phila. Ct. Comm. Pl. Nov. 1, 2007) [Resp't Ex. O].  The Superior Court, however, disagreed with O'Donnell's assertions as to the evidentiary value of the 911 calls and the prejudice to O'Donnell:

> Despite O'Donnell's characterizations to the contrary, the two 911
> calls do not disprove that she was part of a premeditated murder.  The
> 911 calls, even if admissible, could establish only that O'Donnell and

---

[12]  Two calls were made to 911 concerning the Richmond Street address.  In one call, received at 2:42 a.m., a female caller said she was being beaten by her husband.  In another call, received at 2:57 a.m. and believed to have been placed by upstairs neighbor Joe Boles, a man reported a disturbance in the ground floor apartment and what sounded to him like a man murdering a woman.

>Gribble were involved in an argument. The first call, made by
>O'Donnell, could only prove that Gribble was physically assaulting
>O'Donnell. The second call, placed by Boles, could only prove that
>Gribble and O'Donnell were involved in an altercation. There is no
>evidence concerning the time that the calls were placed relative to the
>murder, *i.e.,* whether they were placed before, during, or after the
>murder. Accordingly, O'Donnell failed to meet her burden in
>establishing prejudice and would not be entitled to relief on this basis.

*Commonwealth v. O'Donnell*, No. 1269 EDA 2007, slip opin. at 10-11 (Pa. Super. Ct. Oct. 31, 2008)

[Resp't Ex. R].[13]

We do not find the Superior Court to have applied *Strickland* unreasonably in rejecting this claim on PCRA appeal. While Petitioner asserts somewhat simplistically that Attorney Dunham must have performed deficiently in not asserting this claim as part of the direct appeal to the Pennsylvania Supreme Court in 1997 because it would have been meritorious, we share the Superior Court's doubt that this claim, if asserted then, would have been reasonably likely to have caused the Pennsylvania Supreme Court to set aside the conviction for first-degree murder. The 911 tapes do not establish the time of the killing with such precision that they could be used to rule out O'Donnell's presence during, and physical participation in, at least critical portions of the attack

---

[13] The court also demonstrated in its opinion its appreciation of the prejudice prong of the *Strickland* analysis, explaining:

>"Prejudice is established when [a defendant] demonstrates counsel's chosen course
>of action had an adverse effect on the outcome of the proceedings." *Commonwealth
>v. Chambers*, 807 A.2d 873, 883 (Pa. 2002) (quoting *Commonwealth v. Balodis*, 747
>A.2d 341, 343-44 (Pa. 2000)). "Prejudice in the context of ineffective assistance of
>counsel means demonstrating that there is a reasonable probability that, but for
>counsel's error, the outcome of the proceeding would have been different."
>*Commonwealth v. Cox*, 863 A.2d 536, 546 (Pa. 2004). "A reasonable probability is
>a probability sufficient to undermine confidence in the outcome." *Chambers*, 807
>A.2d at 883 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

*Commonwealth v. O'Donnell*, No. 1269 EDA 2007, slip opin. at 13 (Pa. Super. Ct. Oct. 31, 2008).

upon and dismemberment of Eleftheriou.  Her call neither establishes nor supports a claim of innocence on her part.  Moreover, even if O'Donnell were not present and a participant in the physical crimes upon Eleftheriou, it was uncontested at trial that she admitted him to the apartment, and a host of circumstances supported the theory that she participated in a premeditated plan to invite him there that particular night to rob him and to attack him with a deadly weapon.  O'Donnell's conduct with respect to the 911 operator, emergency responders, and hospital personnel  does not exculpate her but rather suggests that she was operating under a misguided or drug-induced effort to cover-up her actions.  We are not prepared to accept that there was a reasonable probability that she would have been acquitted at trial if Attorney Sigal had presented this evidence.

Moreover, focusing as we must upon whether Dunham failed to conform to Sixth Amendment standards in his representation of O'Donnell in the direct appeal, we note that this was hardly the strongest claim of ineffective assistance of trial counsel that could have been raised to the state Supreme Court.  Dunham raised five claims concerning the guilt phase of the trial, all of which the high court took the time to discuss on the merits and none of which it suggested were frivolous, even if the court did not ultimately agree that Dunham had identified a basis for disturbing O'Donnell's convictions.  In addition, it was also incumbent upon Dunham to advance his strong arguments that the court should vacate the death sentence — one of which garnered the support of the court and led to the remand for a new penalty phase hearing.  Moreover, as the PCRA Court recognized, as it considered the stewardship of Dunham in the earlier stage of proceedings:

> [C]ounsel has no duty to raise every possible claim on appeal.  It is the job of counsel to decide which issues to present to an appellate court for review.   Appealing losing issues only serves to bury the stronger claims raised on behalf of a defendant.  Therefore, the "process of winnowing out weaker arguments on appeal and focusing

21

> on those more likely to prevail . . . is the hallmark of effective
> appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 535 (1986)
> (*quoting Jones v. Barnes*, 463 U.S. 745, 751-53 (1983);
> *Commonwealth v. Laboy*, 333 A.2d 868 (Pa. 1975).

*Commonwealth v. O'Donnell*, No. CP-51-CR-1220812-1992, slip opin. at 20 (Phila. Ct. Comm. Pl.

Nov. 1, 2007) [Resp't Ex. O]. As it was, Dunham had to request leave of court to file a brief that,

at 140 pages, was far in excess of the 70-page limitation set by state rules. *See* Pa.R.A.P. 2135. It

was thus incumbent upon him to select his issues carefully. Petitioner has not made any attempt to

assert that Dunham performed deficiently in failing to advance an issue as to Sigal's ineffectiveness

in not presenting the 911 tapes or live testimony from Boles at trial other than to say that this issue

would have been meritorious. This approach fails to recognize the situation as Dunham faced it

when he was shepherding the then-capital case through the direct appeal stage. We cannot conclude

that the state court interpreted *Strickland* unreasonably in finding that O'Donnell was not prejudiced

by the failures of any of her attorneys as to this proposed evidence. We will not recommend that

habeas relief be granted based upon this claim.

> ### 2. Ineffective assistance of counsel claim concerning the failure to introduce hospital records indicating the length of Petitioner's hospital stay to allegedly give Petitioner an alibi

In her second claim, Petitioner alleges that her appellate counsel was ineffective for not

raising the claim of trial counsel ineffectiveness relating to the failure to introduce hospital records

that she contends would have served as an alibi for the time period in which Eleftheriou's body was

presumably dismembered, causing his death. (Pet'r Br. at 61-68.) Her claim relates to records from

Northeastern Hospital of Philadelphia obtained by Attorney Brandeis post-trial, which reflect that

an "Angelina Bonanno"[14] was released from the hospital at 5:05 a.m. on the day that Eleftheriou was believed to have been killed and approximately two hours after medics transported O'Donnell from the 3123 Richmond Street address to Northeastern Hospital.[15]  Petitioner argues that since she was in the hospital for two hours shortly after when she contends the attack on Eleftheriou occurred, she could not have been involved in his death, particularly where the medical examiner testified at trial that the dismemberment of the neck and arm were the cause of death.[16]  She observes that the Commonwealth insinuated in a question asked of the paramedic who transported her to the hospital that O'Donnell might have left the hospital soon after her admission and returned to the crime scene and that proof of a bona fide admission would have been valuable.  She also suggests that she has established the prejudice from the absence of these records at trial because when they were introduced at her 2002 penalty phase hearing, the jury found that the robbery aggravator advanced by the Commonwealth for the death penalty had not been proven.

---

[14]  This is the name on the registration and discharge papers.  On one nursing note, the patient is identified as "Angelina Kelly Bonanno."

[15]  The police incident report memorializing this "hospital case" incident from 3123 Richmond Street around 3:00 a.m. listed the complainant as "Gina Bonanno."  The name she gave the medics that transported her was "Angela Kelly."  *See* PCRA Pet. at Exs. G, H [Resp't Ex. I].

[16]  Petitioner also argues that there was testimony from "the Commonwealth's medical expert" that the decedent was dismembered during the first hour following the initial hammer attack. (Pet'r Br. at 61-62.)  We do not see, in the portion of the 1993 trial transcript to which Petitioner cites, any support for the proposition that the medical examiner testified at trial that the dismemberment process was either commenced or completed within one hour following the initial hammer attack.  At the penalty phase hearing, the medical examiner testified that he estimated, based on the physical difficulty of the task, that the total amount of time it would take to dismember Eleftheriou's body would be "somewhere on the order of around an hour." (N.T. 1/31/02 at 54.  *See also id.* at 70.)  We are unaware of the trial testimony, however, touching upon the amount of time that would have been required to complete the dismemberment or whether there was any evidence that it was completed all at once.

The Pennsylvania Superior Court rejected this claim on PCRA appeal, finding that while the records might have established the time of Petitioner's departure from the hospital, they did not establish her innocence as to the killing or further dismemberment of Eleftheriou's body.  The court concluded that the time that she was away from the crime scene at the nearby hospital was not relevant because the time of Eleftheriou's death could not be established with any certainty.  Accordingly, the court found that she could not establish that she was prejudiced by the absence of these records at trial.[17]  The Superior Court's rejection of this claim cannot be deemed unreasonable, particularly where there was much evidence — and much of it unchallenged — that supported the

---

[17] In denying relief on this claim in the first instance, the PCRA Court also noted that it could not deem trial counsel to have performed deficiently when the record memorialized that he had attempted to obtain documentation relating to Petitioner from Northeastern Hospital but was unable to locate any such documents.  In the course of a colloquy held just before the suppression motions were heard on June 15, 1993, O'Donnell stated that she was not satisfied with Sigal's representation and that she believed he had not "gotten all the records" needed for her case.  (N.T. 6/15/93 at 15.)  Sigal responded that he "had trouble and great expense incurred [sic] in an effort to obtain medical records for Mrs. O'Donnell" and related that she had been unable to identify for him the numerous names she had used.  The name that she gave him that morning was one which she said she had given him months earlier — a claim that he disputed.  The court, here Judge O'Keefe, explained to O'Donnell:

> Now, Mr. Sigal told us this morning that you gave him a name. . . .  All right, and in fact, the district attorney and your lawyer and both counsel in my presence called the hospital and they checked the computer and you were never treated under the name that you gave counsel.  The district attorney in fact gave two or three other names, they checked the computer.  So any and all names you gave counsel or the Commonwealth was able to find out, there is no record of you having been treated at Northeast Hospital under those names.

(N.T. 6/15/93 at 16-17.)  *See also Commonwealth v. O'Donnell*, CP-51-CR-1220812-1992, slip opin. at 12 (Phila. Ct. Comm. Pleas Nov. 1, 2007) (citing N.T. 6/15/93 at 16-17); *id.* at n.7 (observing that Petitioner argued on PCRA review that trial counsel should have known that she gave police the name "Gina Bonanno" when they responded to the 911 call placed at 2:42 a.m. and the name "Angel [sic] Kelly" to paramedics, and therefore should have been able to find hospital records under the name "Angelina Kelly Bonanno" — an argument that the court found "absurd, and far beyond the expectations for even highly competent counsel").

notion that O'Donnell conspired with Gribble to rob and murder Eleftheriou and that, even if she did not participate in the hammer attack and/or dismemberment, those actions were taken by Gribble in accordance with a plan they formed together.  Petitioner's highly speculative argument — that the fact-finder "might well have concluded" that Gribble attacked the victim alone and dismembered him alone while O'Donnell was in the hospital, *see* Pet'r Br. at 66 — is simply not sufficiently probable to warrant relief on this *Strickland* claim.  This is particularly so where her argument as to deficient performance by Attorney Sigal is weakened by the record demonstrating his efforts to obtain the hospital reports and where her argument as to Attorney Dunham's subsequent ineffectiveness fails to acknowledge that he presumably *had* access to these records, since they appear to have been in the possession of Attorney Brandeis at the 1994 post-verdict motions hearing and thus must be presumed to have made a calculated decision not to advance a *Strickland* claim of this sort when challenging O'Donnell's conviction and sentence on direct appeal.

The Superior Court identified legitimate reasons why establishing the time period in which O'Donnell was outside of the apartment would not have impacted the result in this case.  For this reason alone, trial counsel cannot be deemed to have been constitutionally ineffective for the absence of this evidence in the trial record, and appellate counsel cannot be deemed to have performed deficiently in not pursuing this issue in the direct appeal of her conviction.  The state court's rejection of this claim presented on PCRA review does not reflect an unreasonable application of the *Strickland* decision.  There was no reasonable probability that, but for counsel's inability to present these records, Judge Ribner would have acquitted O'Donnell at trial.  Accordingly, we do not believe that the writ should not issue based upon this claim.

25

### 3.     Ineffective assistance of counsel claim concerning the failure to rebut the testimony of Commonwealth witness Ada Vega concerning motive

Petitioner's third claim is that her appellate counsel was ineffective for not asserting trial counsel's ineffectiveness in failing to rebut testimony offered by Ada Vega that the Commonwealth utilized to show motive for O'Donnell to rob Eleftheriou that particular evening.  (Pet'r Br. at 71-74.)  At trial, Vega testified that she saw O'Donnell meet with Eleftheriou on the night he was last seen to pawn a leather jacket.  Vega, who worked for Eleftheriou in his pizza shop, testified that he paid O'Donnell in cash from a large roll of money that he took out from his pocket.[18]  Petitioner claims that trial counsel could have refuted this testimony and the Commonwealth's theory about motive for the crime by: (1) impeaching Vega with the statement she gave police, in which she did not describe Eleftheriou paying O'Donnell from a roll of money; (2) impeaching Vega's credibility in general on the grounds that she was then on probation for an arson conviction and would be motivated to exaggerate or fabricate testimony to benefit the Commonwealth in order to secure a favorable final disposition of her arson sentence; and (3) calling another employee of the pizza shop, Rose Ann Stoddart, since her police statement indicated that Eleftheriou paid O'Donnell for the leather jacket that evening with money from the cash register, which would have undermined the notion that O'Donnell would expect Eleftheriou to be carrying a large amount of cash later that evening.  The Pennsylvania Superior Court rejected this claim on PCRA appeal because it found that none of these assertions demonstrated ineffective assistance on the part of Attorney Sigal.

---

[18]  This testimony was used by the Commonwealth to support its theory that O'Donnell lured him to her apartment with the intention of robbing him and that, because he would have been able to identify her, she also formed the intention to kill him.

### a.      Sub-claims involving impeachment of Ada Vega

With respect to the aspects of this claim relating to the vulnerabilities of Vega as a witness that should have been apparent both to Attorney Sigal at trial and Attorney Dunham on appeal, the Superior Court did not discuss whether O'Donnell had made any showing of deficient performance but rather that she could not establish prejudice.[19]  In its rejection of these claims, the PCRA Court determined that "[c]ounsel is not ineffective simply because he failed to question the witness about one detail she testified to at trial which was not contained in the statement she gave to the police."[20] The court also found that it would have been redundant and unnecessary in the 1993 bench trial to further explore the fact that Vega had pled guilty to attempted arson where "[t]he trial judge, sitting as the fact-finder, was surely aware of the implications of the witness' probation status and his ability to consider it in assessing her credibility." *Commonwealth v. O'Donnell*, CP-51-CR-220812-1992, slip opin. at  18-19 (Phila. Ct. Comm. Pl. Nov. 1, 2007).

With both the Superior Court and the PCRA Court pointing to deficiencies in her claim of ineffectiveness of trial counsel, we have no trouble agreeing that O'Donnell has failed to demonstrate that the denial of relief on this layered ineffectiveness claim reflects an unreasonable application of *Strickland*.  In this regard, we note that Attorney Sigal, as well as counsel for Gribble,

---

[19]   The court noted that O'Donnell alleged only that the questioning of Vega on these bases "might well have affected the outcome."  The court appeared to find that degree of prejudice in the pleading and offer of proof insufficient, noting that it could not conclude that "but for" counsel's failure to cross-examine Vega on these issues, the outcome of the trial would have been different. *Commonwealth v. O'Donnell*, No. 1269 EDA 2007, slip opin. at 14 (Pa. Super. Ct. Oct. 31, 2008).

[20]   The police statement did not reflect that Vega was asked where the victim obtained the money which he used to pay O'Donnell for the leather jacket that evening.  *See* Investig. Int. Rec., 11/13/92, *appended to* PCRA Pet. as Ex. K [Resp't Ex. I] (reporting that O'Donnell asked Eleftheriou in the pizza shop if he had money and that "[s]he left the coat and Terry [Eleftheriou] gave her money and a soda").

elicited several admissions from Vega during cross-examination at trial to support their theory of the case — that both defendants materially benefitted from O'Donnell's relationship with Eleftheriou and that it would not have been in their interest to kill him, as well as the fact that there was no reasonable basis to conclude that Eleftheriou possessed such a large quantity of money that evening such that it would have been reasonable for either O'Donnell or Gribble to have decided that it was worth it to rob and then kill him.[21]   The state court's finding that O'Donnell did not demonstrate a deprivation of her Sixth Amendment right to counsel in Attorney Dunham's failure to raise and litigate this aspect of Attorney Sigal's alleged ineffectiveness did not result from an unreasonable application of *Strickland*.  She did not demonstrate that there was a reasonable probability that, had Sigal made these inquiries of Vega on cross, Judge Ribner would have discredited her testimony and found that O'Donnell lacked a motive to rob Eletheriou when she asked to meet him later in the evening and ultimately invited him in to the apartment where she was staying.  In short, O'Donnell did not demonstrate that there was a reasonable probability that Judge Ribner would have acquitted her of robbery, murder, or conspiracy had Attorney Sigal confronted Vega in the manner she suggests.  Accordingly, habeas relief should not be granted for this asserted ground for relief.

### b.      Sub-claim involving use of Rose Ann Stoddart to rebut Vega

With respect to Stoddart, the Superior Court found that O'Donnell had not met her burden to show that the witness she claimed should have been called "was available," as required by the Pennsylvania Supreme Court in cases concerning ineffectiveness claims for failure to call a witness.

---

[21]   For example, counsel elicited from Vega the fact that O'Donnell had sold items to Eleftheriou before, as well as the fact that Vega did not know the denominations of the bills in the roll of cash that she testified she saw him display in O'Donnell's presence.  (N.T. 6/16/93 at 55-57, 61 (Sigal); *id.* at 62-63 (Mirachi).)

As the Superior Court correctly noted, O'Donnell neither alleged, nor demonstrated in the affidavit that she presented to the PCRA Court from Stoddart, that Stoddart "was available and willing to testify at the trial" in 1993.[22] *Commonwealth v. O'Donnell*, No. 1269 EDA 2007, slip opin. at 12-13 (Pa. Super. Ct. Oct. 31, 2008) (citing *Commonwealth v. Chmiel*, 889 A.2d 501, 545-46 (Pa. 2005)). *See also* PCRA Pet. at 36-37 & n.14 (stating in October 2002 that "[a]lthough she was not called as a witness at the new penalty hearing [ultimately held in early 2002], Ms. Stoddart was and remains available to testify," but failing to assert that she could have been located with reasonable investigation and would have been willing to testify in June 1993) [Resp't Ex. I].

In her federal habeas petition, O'Donnell complains about this aspect of the Superior Court's ruling, asserting that it "declined to address any claims pertaining to Ms. Stoddart's potential testimony, because her 2002 affidavit fails to specifically state that, if she had been subpoenaed for Petitioner's trial, she would not have ignored her subpoena." (Pet'r Br. at 75.) She argues that this decision constitutes an unreasonable application of *Strickland*, pointing to the facts that Stoddart was a known witness (having given a statement to police the day after the murder), that trial commenced within a short time (seven months) of the murder, and that Stoddart "willingly signed an affidavit

---

[22]  The affidavit was dated April 30, 2002 and appended to O'Donnell's counseled PCRA petition as Exhibit M.  In the affidavit, Stoddart affirmed that she gave a statement to police detectives on November 13, 1992, that she answered the questions to the best of her memory and ability, and that she tried to tell the police everything she knew as accurately as possible.  [Resp't Ex. I.]  The police statement to which Stoddart refers is also appended to the PCRA petition as Exhibit L.  [Resp't Ex. I.]  The affidavit does not touch upon whether she had any communications with Attorney Sigal leading up to O'Donnell's trial, or with Attorney Dunham during the direct appeal phase.  It is also silent as to her whereabouts at the time O'Donnell was tried in June 1993, some seven months after the crime.

attesting to the truthfulness of her original statement."  (Pet'r Br. at 75.)[23]  She does not provide any further legal argument, nor citations to any authority, for the proposition that the state court's reliance on this deficiency in the record before it on PCRA review could not properly have been the basis for rejecting the claim of ineffective assistance of counsel for failure to call Stoddart in the defense case.  She suggests, however, that the unreasonableness of the Superior Court's application of *Strickland* to this claim relates to the court's conclusion that the available evidence that could have "refuted Ms. Vega's testimony about the money roll," if it had been presented, was not reasonably likely to have affected the outcome of the case.  O'Donnell identifies "the existence of the large money roll on the decedent's person" as "directly relevant to the key disputed issue of fact in this case": whether O'Donnell and Gribble conspired to ambush and rob Eleftheriou or whether Gribble killed him in a jealous rage.  (Pet'r Br. at 76.)

Respondents contend that had Stoddart testified in accordance with her statement, she would have corroborated Vega's account that O'Donnell came to the pizza shop earlier that evening to pawn a leather jacket, that Eleftheriou paid her cash for the jacket from a source of money in full view of O'Donnell, and that they made arrangements for her to repay him the money later that evening.  They minimize the importance of the location of the money accessed by Eleftheriou in the shop that evening — e.g., the cash register as opposed to a money roll kept on his person — and assert that even if this theory of the case were somewhat devalued by the testimony expected of Stoddart, that Eleftheriou paid O'Donnell from the cash register, there was still no reasonable

---

[23]  Petitioner also asserts in her habeas petition that Ms. Stoddart "still lived in the area" when PCRA counsel secured her affidavit in 2002.  Her affidavit, however, does not indicate either her address at that time nor her address at the time of trial in June 1993, nor does it state whether her home address at either of those times was the same as that indicated on the police statement of November 13, 1992.

30

probability that Judge Ribner would have accepted the notion that Gribble alone attacked Eleftheriou in a fit of jealous rage and find that O'Donnell played no role in the hammer attack, the dismemberment, or the robbery of Eleftheriou.  We agree that O'Donnell's participation in a conspiracy was strongly supported not only by her actions in bringing Eleftheriou to the apartment at a time that McClinchey was out of town but also by the uncontradicted evidence that she used Eleftheriou's credit card with Gribble the next day, that she knew of the hiding place of parts of the victim's remains, that she directed Gribble in the destruction of evidence of the murder, and that she passed upon opportunities to tell police or medical personnel that a man had been brutally attacked in her presence.  To the extent that O'Donnell suggests that the Commonwealth could not account for a motive to rob and kill Eleftheriou that particular night were it not for the fact that she had observed him — uncharacteristically, according to Vega — to be carrying a large quantity of bills on his person earlier that evening, we cannot agree that this would have resulted in a reasonable probability of acquittal in light of these other facts.

The state court's finding that O'Donnell failed to show deficient performance of Attorney Sigal by not demonstrating that Stoddart was available to testify at the June 1993 trial did not reflect an unreasonable application of *Strickland*, particularly where the absence of this proposed testimony cannot be said to have prejudiced her within the meaning of *Strickland*.  In addition, our discussion *supra* about the presumed strategy of appellate counsel in selecting the strongest arguments for appeal applies with equal force here.  O'Donnell has failed to demonstrate that this claim should reasonably have been recognized to carry with it a greater likelihood of success on direct appeal in 1997 than did the five other guilt-phase issues that Attorney Dunham raised.  As she failed to demonstrate Dunham's ineffectiveness in not advancing this claim, we are unable to recommend that

habeas relief be granted on this claim.[24]

####     4.     Constructive denial of counsel claim due to trial counsel's cocaine addiction

In the fourth ground for habeas relief that O'Donnell asserts in her petition, she contends that she was "constructively denied" her constitutional right to counsel due to the cocaine addiction of Attorney Sigal which, she contends, resulted in him "unaccountably fail[ing] to present readily available evidence establishing actual innocence." (Pet'r Br. at 78.) She asserts that all post-conviction counsel were ineffective for failing to raise this claim on appeal.[25] (*Id.*) Her claim is based upon the facts that: (1) in testimony in an unrelated matter on June 11, 1997, four years after he represented O'Donnell, Attorney Sigal acknowledged that he had been battling a drug addiction "for years" (PCRA Pet. at Ex. C, p. 20 [Resp't Ex. I]); (2) he further testified that he had been experiencing several problems in his life since his mother passed away and that "they have affected my ability to perform as an attorney" (PCRA Pet. at Ex. C, p. 5); (3) he had failed to appear for court on June 7, 8, and 9, 1993, when O'Donnell's trial was to begin, and could not be reached by court personnel (PCRA Pet. at Ex. D); (4) a legal secretary attested in 2002 that Sigal was "very unstable" during the six-year period of her employment with him, that he "would disappear on cocaine binges for days at a time" and would "often miss court dates" during those binges, and that he was held in

---

[24] We note as well that Judge Mazzola, on PCRA review, offered his belief that Stoddart's testimony would have been more harmful to Petitioner and that it would have been subject to effective impeachment, as her statement did not demonstrate her to have been particularly observant or well-informed about how Eleftheriou safeguarded or spent the pizza shop's money. *See Commonwealth v. O'Donnell*, No. CP-51-CR-1220812-1992, slip opin. at 18 (Phila. Ct. Comm. Pl. Nov. 1, 2007).

[25] Unlike other sections of her petition, however, she does not provide any argument, even boilerplate, about the ineffectiveness of appellate counsel in not raising this claim.

contempt by various judges during that period for failing to appear for court (PCRA Pet. at Ex. B); and (5) Sigal was arrested during the time period in which O'Donnell's PCRA petition was pending on charges of DUI, criminal mischief, and aggravated assault. (Pet'r Br. at 78.)  Petitioner argues that Sigal's cocaine addiction resulted in him not adequately preparing or presenting her case. (Pet'r Br. at 81.)

The claim that O'Donnell advances as to her "constructive denial of counsel" appears to seek the application of an ineffectiveness standard set out by the Court in *United States v. Cronic*, 466 U.S. 648 (1984).   In *Cronic*, which was issued alongside *Strickland*, the Court spoke of "presumptively prejudicial circumstances" in the Sixth Amendment context, where the cost of litigating the effects of circumstances that were "so likely" to prejudice the defendant is unjustified.  *Id.* at 658-59.  The first of the circumstances identified by the *Cronic* Court, and the "[m]ost obvious," was the "complete denial of counsel" at a critical stage.  *Id.* at 659.  Second, the Court suggested that prejudice could be presumed if "counsel entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." *Id.*  Finally, the Court indicated that it would not require the defendant to prove prejudice where counsel was called upon to render assistance under circumstances where competent counsel very likely could not.[26]  *Id.* at 659-62.

Since the *Cronic* and *Strickland* decisions were issued in 1984, the Court has continued to assert the limited application of *Cronic*.  In *Bell v. Cone*, 535 U.S. 685 (2002), for example, the

---

[26]  The Court gave the example of *Powell v. Alabama,* 287 U.S. 45 (1932), a case in which the trial court did not definitively designate any particular attorney to represent any individual in a group of defendants facing capital charges who were surrounded by a hostile community until the morning that trial began.  The Court in *Powell* noted that no attempt had been made by counsel to investigate the charges, nor did counsel have an opportunity to do so, and that any attorney needs an opportunity to prepare for the client's day in court.

petitioner, Cone, asserted that his Sixth Amendment claim should have been considered under *Cronic* because his counsel failed to "mount some case for life" after the prosecution introduced evidence in the sentencing hearing and gave a closing statement. The Court disagreed. It explained that when it spoke in *Cronic* of presuming prejudice based upon an attorney's "failure to test the prosecutor's case," as O'Donnell claims here, the failure must have been "complete." The *Bell* Court reiterated: "We said 'if counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing.'" *Bell*, 535 U.S. at 696-97 (quoting and adding emphasis to *Cronic*, 466 U.S. at 659). The Court noted that petitioner Cone's argument was not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points. The Court determined that, "[f]or purposes of distinguishing between the rule of *Strickland* and that of *Cronic*, this difference is not of degree but of kind." *Id.* at 697. The Court found that the aspects of counsel's performance that were challenged by the petitioner — the failure to adduce mitigating evidence and the waiver of closing argument — were "plainly of the same ilk as other specific attorney errors we have held subject to *Strickland's* performance and prejudice components." *Bell*, 535 U.S. at 697-98 (citing cases). Accordingly, the Court found that the state court's decision to apply *Strickland* rather than *Cronic* as the governing analysis did not amount to an adjudication that was contrary to clearly established Supreme Court precedent. *Id.* at 698.

Here, O'Donnell asserts that the various specific omissions discussed elsewhere in the petition constitute the evidence of Attorney Sigal's failure to subject the prosecution's case to any "meaningful adversarial testing." For example, she relies upon Sigal's failure to present evidence suggesting that O'Donnell telephoned the police during the attack and urged them to come to the crime scene as quickly as they could; that Boles, the neighbor, heard her screaming and yelling "stop

34

that"; that O'Donnell was being seen at the hospital during a critical time period; that there was a basis to refute the Commonwealth's motive witness; and that the Commonwealth's medical expert's testimony was allegedly flawed.  (Pet'r Br. at 80-81.)  These omissions upon which O'Donnell's claim of deficient performance are based are "plainly of the same ilk" as the errors that the Supreme Court in *Cronic* held were subject to the two components of the *Strickland* standard.  Therefore, we agree with the Superior Court that the appropriate analysis for the consideration of this claim was that of *Strickland* rather than that of *United States v. Cronic*, 466 U.S. 648 (1984).

The Pennsylvania Superior Court rejected this contention on PCRA appeal as a *Strickland* claim because it found that Petitioner had not demonstrated that she was entitled to relief on any of the specific claims of deficient performance raised and because she had not demonstrated that Sigal was actually under the influence of drugs in June 1993 when she was tried.  *Commonwealth v. O'Donnell*, No. 1269 EDA 2007, slip opin. at 16-17 (Pa. Super. Ct. Oct. 31, 2008) [Resp't Ex. R]. The court did not agree with O'Donnell that her claims of trial counsel's drug use during trial obviated the need for her to demonstrate either deficient performance or prejudice.  *Id.* at 16 (and citing to Superior Court precedent for proposition that drug use by counsel during trial does not *per se* render performance ineffective and that "[t]he critical issue is whether, for whatever reason, counsel's performance was deficient and whether the deficiency prejudiced the defendant").

Petitioner contends that the Superior Court unreasonably applied *Strickland* as to this claim because, "[f]or the reasons set forth in [her] petition, trial counsel's performance was plainly deficient."  (Pet'r Br. at 81.)  She contends that "the likelihood that counsel's cocaine addiction had rendered him incapable of preparation is plain," as evidenced by the fact that he failed to appear, without explanation apparent in the record, for the first three days of trial in this capital case.  (*Id.*)

35

She also argues that his cocaine addiction would account for Sigal's presumed failure to read the discovery materials, which she believes caused him to fail to meaningfully test the Commonwealth's case, as outlined in the specific instances of ineffective assistance that she alleged. (Pet'r Br. at 81-82.)

O'Donnell cannot obtain relief on this claim without demonstrating prejudice.[27]   Her examples of prejudice are Sigal's failures to take the various actions that are otherwise addressed in her petition.  The Superior Court determined that, had counsel acted in accordance with the strategy she now suggests he should have, there was no reasonable likelihood that O'Donnell would have been acquitted.  For all of the reasons set forth elsewhere in this Report, we do not find this conclusion to be unreasonable.  Moreover, given that O'Donnell has failed to make any showing or advance any argument that Attorney Dunham performed deficiently in not raising this claim on the direct appeal to the Superior Court in 1997, at a time before Sigal testified in Municipal Court regarding his drug addiction and before public disciplinary action was taken against him, we cannot recommend that habeas relief be granted on this claim.

---

[27]  The Superior Court found that O'Donnell could not demonstrate that Attorney Sigal had "performed deficiently" by representing her while abusing drugs because there was no evidence that he was, in fact, using drugs at the time he represented her.  While Petitioner blames a deficiency in the factual record on the state court's refusal to permit her an evidentiary hearing to develop these facts, she did not make a sufficient proffer to warrant further inquiry.  We would think it would not have been difficult to relate Attorney Sigal's alleged drug addiction to the particular, critical period of time at issue here — June 1993.  Despite PCRA counsel having made contact with a member of Sigal's support staff, the proffer obtained fails to date the period of addiction at all.  Moreover, aside from notations regarding Sigal's failure to appear before trial began, Petitioner points to nothing in the record of this case — either in comments of the ADA, counsel for the co-defendant, or either Judge O'Keefe or Judge Ribner — betraying any suspicious that Sigal was under the influence of any drugs during this trial.

**5.     Ineffective  assistance  of  counsel  claim  concerning  failure  to engage  expert  to  rebut  medical  examiner  testimony  that  two people were necessarily involved in the dismemberment**

In her fifth claim, Petitioner alleges that her trial counsel was ineffective for not presenting expert testimony to refute the trial testimony of the medical examiner that two persons were involved in the dismemberment and that the dismemberment caused the victim's death — testimony that she characterizes as "extremely damaging to [her] defense." (Pet'r Br. at 83.)  She points to evidence offered by a defense forensic pathologist, Dr. Charles Wetli, at the penalty phase hearing that was convened in 2002 on remand from the Pennsylvania Supreme Court, in which he testified that there was no way to determine from the physical evidence whether one or more persons participated in the dismemberment.  (Pet'r Br. at 83-84.)  She also contends that trial counsel failed in the 1993 trial to elicit from the testifying medical expert findings reflected in his report that were favorable to the defense, including the fact that there was evidence of a face-to-face struggle, which Petitioner alleges was consistent with Gribble's account of a fight instigated by him in a jealous, drunken rage and inconsistent with O'Donnell's description that she hit Eleftheriou on the back of his head with the hammer.  (Pet'r Br. at 84.)[28]  She contends that if the Commonwealth's forensic evidence had been

_____

[28]  Petitioner also asserts in her brief as part of this claim that trial counsel was ineffective for failing to challenge the medical examiner's qualifications and point to his inexperience, as he had only served in the position for 2 ½ years and had no prior experience or expertise in the area of human dismemberment, nor had he consulted with a more experienced practitioner or consulted any published materials.  _See_ Pet'r Br. at 84 (citing N.T. 1/31/02 at 80-83).  She also asserted this position in her PCRA appeal concerning this ineffectiveness claim.  The Superior Court, however, found that while Petitioner articulated in the argument section of her brief her contention that trial counsel should have challenged the medical examiner's expertise as one of the components of this ineffectiveness claim, she had not identified that issue in her Statement of questions presented. _Compare_ Br. of Appellant at 24-25 (argument set out as sub-section of claim relating to failure to introduce expert testimony to refute claim that two persons involved in dismemberment) _with id._ at 4 ("Statement of Questions Presented" section of appellate brief raising question only of whether

(continued...)

subjected to a serious defense challenge and the factfinder informed that the forensic evidence did

not establish that two persons were necessarily involved in the dismemberment, then the factfinder

"might well credit Petitioner's claim that she played no part in the murder."  (Pet'r Br. at 85.)

The Superior Court rejected this claim on the PCRA appeal on the grounds that the proposed

testimony, that of Dr. Wetli, which O'Donnell suggests would have "debunked" Dr. Lieberman's

determination that two persons were involved in the victim's murder, would not have accomplished

that goal.  Rather, the court found:

> Dr. Wetli did not unequivocally testify, as O'Donnell's argument
> suggests, that the dismemberment was carried out by a single person.
> At the hearing, Dr. Wetli specifically stated,
>
>> I can only tell you that based upon the physical
>> evidence **I could not say that two people had to
>> necessarily perform the dismemberment.  They
>> could have** but I can't tell from the photograph and
>> materials reviewed objectively that that happened.
>> One person could have done this.
>
> N.T. (Penalty Hearing), 2/1/02, at 27 (emphasis added).  Because Dr.
> Wetli's testimony clearly established that two people may have
> carried out the dismemberment, O'Donnell's argument lacks
> merit.[Footnote omitted.]

*Commonwealth v. O'Donnell*, No. 1269 EDA 2007, slip opin. at 14-15 (Pa. Super. Ct. Oct. 31, 2008)

---

[28](...continued)
"trial counsel ineffectively fail[ed] to introduce expert medical testimony which would have
debunked the medical examiner's flawed forensic determination that two persons were necessarily
involved in the victim's murder" and the ineffectiveness of all subsequent counsel for failing to raise
this claim).  Relying upon Pa. R.A.P. 2116(a) for the proposition that "issues not presented in the
statement of questions involved portion of a brief will not be considered on appeal," the Superior
Court deemed the issue to be waived and did not discuss it further.  *See Commonwealth v.
O'Donnell*, No. 1269 EDA 2007, slip opin. at 15 n.4 (Pa. Super. Ct. Oct. 31, 2008) [Resp't Ex. R].
Petitioner neither acknowledges this Superior Court determination in her brief nor challenges it.  *See*
Pet'r Br. at 86-87.  We will consider this aspect of Petitioner's claim to be procedurally defaulted.

[Resp't Ex. R].  In similarly concluding that Petitioner had failed to establish a basis for relief on this claim, the PCRA Court also noted that Petitioner did not identify in her PCRA pleadings any expert witness available at the time of trial to rebut the medical examiner's testimony and that Attorney Sigal cross-examined Dr. Lieberman extensively at trial, even eliciting testimony that it was possible that the victim was dismembered by only one person.  *See Commonwealth v. O'Donnell*, CP-51-CR-220812-1992, slip opin. at 13-14 (Phila. Ct. Comm. Pl. Nov. 1, 2007) [Resp't Ex. O].

Both parties appreciate that the question of whether one person or two were involved in dismembering Eleftheriou is not outcome-determinative.  Even if O'Donnell did not physically participate in the dismemberment of Eleftheriou nor the hammer attack that preceded it, she would be liable for first degree murder if Gribble carried out these actions pursuant to a plan, the formation of which involved O'Donnell's participation.  Petitioner asserts, however, that there are certain factors that cause the allegedly shifting expert testimony on this subject to take on greater significance and raise a "reasonable probability" that the outcome of the guilt phase might have been different had the factfinder heard at trial in 1993 the additional medical expert testimony provided by Dr. Lieberman and the new testimony provided by Dr. Wetli in 2002.  First, she points to the fact that the Commonwealth at trial appeared to have postured its case against O'Donnell as one of guilt by participation.  In addition, she notes that on collateral review the Commonwealth sought to undermine her attempts to use the 911 calls and hospital records to provide her an alibi for the time of death, further suggesting that the Commonwealth found it necessary to tie her to the crime scene at a time when Eleftheriou "could have" been killed.

In finding that relief was not due on this layered claim of ineffectiveness, the state court did not unreasonably apply *Strickland*.  First, Petitioner made no proffer that the testimony offered by

Dr. Wetli in 2002 would have been available to her for Attorney Sigal to have presented when she was tried in 1993. In addition, we find neither the additional testimony offered by Dr. Lieberman, the Commonwealth's medical expert, when re-examined in 2002 nor the testimony offered by Dr. Wetli to have materially altered the factual record that was before Judge Ribner at the time of O'Donnell's 1993 bench trial. Both doctors agreed that the evidence before them in terms of the remains of Eleftheriou could not conclusively establish how many people participated in the dismemberment process nor what their physical capabilities, when enhanced by the drugs that both O'Donnell and Gribble used, might have enabled them to do. Dr. Lieberman's testimony at trial in 1993 was that the color of the wounds at the neck and one arm indicated to him that those two extremities were severed before Eleftheriou's heart had stopped beating and that he believed there was only a remote possibility that a single person could have accomplished that before the heart would have stopped beating and the wounds would have appeared different in color.

Petitioner asks us to determine that there was a reasonable probability that Judge Ribner would have found Gribble alone to be responsible for the death of Eleftheriou, presumably accepting Gribble's statement that he killed Eleftheriou in a fit of jealous rage, had the medical expert testimony been slightly different. However, there was still a wealth of evidence to indicate that O'Donnell was a conspirator in this planned killing, even if it were not accomplished at her hands. As Judge Ribner noted in his opinion explaining his ruling on the post-verdict motions, it was not contested that Eleftheriou was beaten and dismembered with tools that were ordinarily kept in the basement of the house, not the living room where he was killed, which suggested a premeditated plan to have deadly weapons on hand to attack Eleftheriou. *See* N.T. 6/29/93 at 419. Moreover, it was O'Donnell who brought Eleftheriou to the apartment. It was also uncontested that, around 6:00 p.m.

on November 12, 1992, hours after Eleftheriou was killed, O'Donnell used his credit card to make a purchase at a Philadelphia store where she and Gribble had gone shopping. *See Commonwealth v. O'Donnell*, No.s 2093-2104, Dec. Term 1992, slip opin. at 3-4 (Phila. Ct. Comm. Pl. June 8, 2005) [Resp't Ex. D].  In addition, there was unrefuted evidence presented at trial that on November 13, 1992, O'Donnell admitted to Agnes McClinchey, in whose apartment they stayed, that she and Gribble had been involved in a murder in the apartment; that O'Donnell provided the police with information on the location of hidden remains of Eleftheriou; and that she provided instruction to Gribble on the disposal of other remains and the destruction of evidence of the death of Gribble and their possession of his car.  While Petitioner suggests that the evidence supported a finding of guilt only as to being opportunistic and to trying to cover up evidence of a deadly assault that took place in her presence, her actions are inconsistent with that theory.  In the 911 call that O'Donnell claims she placed from the Richmond Street address at 2:42 a.m., she did not report that someone was being assaulted in her presence, nor did she answer the door when police responded to her call shortly thereafter.  When she again spoke with responding police officers around 3:00 a.m., was transported to the hospital, and treated by medical personnel during the period from 3:10 a.m. to 5:05 a.m., she again did not report that anyone was in danger at the Richmond Street house from which she was transported.  In addition, the interlocking, apparently coordinated confessions of O'Donnell and Gribble also supported the Commonwealth's theory that they conspired together to commit the various offenses against Eleftheriou.

We do not find the approach to the medical expert testimony that Petitioner advances here to be significantly material to the most critical evidence of her guilt.  Regardless of whether one or two persons engaged in the dismemberment of Eleftheriou's body, she was subject to criminal

liability as an accomplice and co-conspirator.  There was much evidence of O'Donnell's conspiracy to commit these offenses such that we do not believe it reasonably likely that Judge Ribner would have acquitted her of first degree murder had Dr. Wetli's testimony been put before him in 1993. Given the prejudice that O'Donnell must demonstrate in order to prevail on a claim of ineffective assistance for the failure of trial counsel to have presented this evidence, we are unable to conclude that the state court's rejection of this claim was unreasonable.  Moreover, given the lack of any proffer that the testimony ultimately offered by Dr. Wetli in 2002 was available at the time of trial in 1993 and that counsel did not make any effort to present such evidence, the state court did not unreasonably determine that O'Donnell failed to show deficient performance on the part of Attorney Sigal.  Finally, she has not made any showing that the availability of this opinion evidence was known to Attorney Dunham at the time he prepared her direct appeal and raised a number of claims of ineffective assistance of trial counsel in 1997.  She has not impeached his representation with respect to the handling of the medical evidence and the treatment of the Commonwealth's medical expert on this point, nor shown that this claim should have appeared obviously more meritorious to Attorney Dunham such that he should have selected this issue to pursue on appeal at the expense of one of the other guilt phase issues raised.  The Superior Court decision denying relief on this claim was neither contrary to nor an unreasonable application of *Strickland*.  Accordingly, we recommend that the writ not issue on this claim.

> **6.    Ineffective assistance of counsel claim concerning failure to introduce expert testimony regarding O'Donnell's physical incapacity to participate in the crimes**

Petitioner's sixth claim, and her final claim asserting a specific instance of trial counsel ineffectiveness, is that Attorney Sigal was ineffective for failing to introduce expert medical

testimony that she was physically incapable of performing certain acts to which she confessed, specifically, the single-handed bludgeoning of Eleftheriou, the transport of his body to the basement, and the subsequent dismemberment of his body.  (Pet'r Br. at 88.)  In support of this proposition Petitioner refers to the testimony from her 2002 penalty phase hearing of hand specialist Dr. Randall Culp, who opined, based on tests he had her perform in 2000, that O'Donnell lacked the grip strength to use a hammer for more than a few strikes or to saw through a femur bone with a hacksaw.  She argues that a medical expert was needed to provide scientific support for the "common sense" contention that she would not have been able to be "the main participant" in the activities described in her confession.  (Pet'r Br. at 90-91.)  *See also* N.T. 2/4/02 at 65 (Dr. Culp testimony).[29]

O'Donnell presented this issue to the state court on PCRA review.  Both the PCRA Court and the Superior Court observed that she had failed to proffer that there was an expert willing and available to testify at trial in 1993 that her hand condition would have prevented her from being able to perform in November 1992 any of the acts to which she had confessed — namely, the single-handed assault and dismemberment of Eleftheriou.  More importantly, however, the state court observed that Attorney Sigal argued in his closing at trial that her deformed hands made it highly improbable that she alone would have performed these actions such that this issue was already known to Judge Ribner.  *See, e.g., Commonwealth v. O'Donnell*, CP-51-CR-220812-1992, slip opin. at 14-17 (Phila. Ct. Comm. Pl. Nov. 1, 2007) [Resp't Ex. O].[30]  In addition, the state courts found

---

[29] O'Donnell was missing some fingertips and both hands were covered with skin grafts from surgeries following third-degree burns she suffered as a child.

[30] Even counsel for Gribble remarked in his closing that O'Donnell's deformed hands made it unlikely that she had dismembered Eleftheriou.  This remark presumably was designed to show a flaw in the Commonwealth's over-arching theory that O'Donnell and Gribble conspired to commit

(continued...)

that this evidence did not undermine the theory advanced by the Commonwealth at trial that neither defendant performed these acts unilaterally or independently but that they rather acted in concert. Therefore, the court determined that O'Donnell had failed to establish that she was prejudiced by the absence of this expert testimony at the time of her 1993 trial. *Commonwealth v. O'Donnell*, No. 1269 EDA 2007, slip opin. at 15-16 (Pa. Super. Ct. Oct. 31, 2008) [Resp't Ex. R].

The state court's finding as to the lack of prejudice to O'Donnell does not reflect an unreasonable application of the *Strickland* standard. As with the previous claim, we do not believe it reasonably likely that Judge Ribner would have acquitted O'Donnell of first degree murder even if presented with Dr. Culp's testimony. Rather, although his opinion addressing post-trial motions did refer to the prosecution's theory, as supported by the medical examiner's testimony, that both O'Donnell and Gribble had participated in the dismemberment of Eleftheriou, he had before him — and cited to — more compelling evidence of O'Donnell's complicity in Eleftheriou's fate that night apart from any medical source theorizing about how the dismemberment could or could not have been accomplished. Given that O'Donnell was culpable for first degree murder if she invited Eleftheriou to the Richmond Street house with the intention that he be attacked with a deadly weapon, the proposition that she lacked the physical capacity to accomplish or participate in the act of striking Eleftheriou or of dismembering him was not determinative. In addition, calling such an expert witness could also have opened the door — as it did at the penalty phase hearing — to evidence about activities of daily living or other actions that O'Donnell was able to perform, which

---

[30](...continued)
a premeditated murder in the course of a robbery — subjecting them both to a possible capital sentence — as opposed to Eleftheriou perishing because Gribble attacked him in the heat of passion, making him liable only for manslaughter.

may well have undermined the expert testimony painting her as a hapless invalid.  In these circumstances, Attorney Dunham cannot be deemed to have performed deficiently in choosing not to raise, on the direct appeal in 1997, a claim of Attorney Sigal's ineffectiveness for not obtaining and presenting expert opinion evidence of this sort at trial in 1993.  The state court's denial of relief on this claim does not amount to an unreasonable application of *Strickland*.  Accordingly, O'Donnell is not entitled to relief on this claim.

### 7.   Claim of "cumulative" ineffectiveness of trial counsel

In her seventh ground for relief in her petition, and the final ground asserting an ineffectiveness claim, O'Donnell asserts that "[t]he cumulative impact of the individual instances of trial counsel's ineffectiveness entitles Petitioner to a new trial." (Pet'r Br. at iii, 92.)  She argues that, "even if this Court were to reject her ineffectiveness claims individually, prejudice may be cumulated among the ineffectiveness claims set forth in her Petition" and that this "cumulative effect of trial counsel's errors" entitles her to relief.  (*Id.* at 92.)  In particular, she focuses upon deficiencies by Attorney Sigal with respect to his failure to introduce evidence that O'Donnell was allegedly screaming "stop that" and calling the police "at the probable time of the murder," his failure to secure hospital records memorializing the length of time in which she was away from the crime scene at the hospital, his failure to present expert testimony to the effect that a single person — *i.e.,* Gribble — could have accomplished the dismemberment, and testimony of Rose Ann Stoddart, who allegedly would have undermined the prosecution's robbery/murder theory.  (*Id.*)  She contends that this evidence "would have confirmed or supported the post-arrest explanation provided by codefendant Gribble, wherein he admitted killing the decedent, unassisted, in a jealous rage." (*Id.*)

As noted by Respondents in their answer to this federal petition, O'Donnell has not alleged

that she presented this claim to the state court, and a review of the record confirms that she did not.

Petitioner's counseled reply brief does not respond to this assertion of procedural default of this cumulative ineffectiveness claim nor otherwise offer any basis for us to excuse her procedural default of this claim.  We conclude that O'Donnell never "fairly presented" this claim to the state courts in accordance with her responsibilities under 28 U.S.C. § 2254(b)(1) during either her direct appeal when represented by Attorney Dunham nor in her subsequent counseled attempts on collateral review to litigate claims of ineffective assistance of trial counsel.  This claim of cumulative ineffectiveness is now procedurally defaulted, and there is no occasion for this Court to further consider its merits unless O'Donnell can establish cause for this default, coupled with a showing that she would be prejudiced by our failure to consider the merits of this claim, or unless she can make a showing of actual innocence such that the default be excused and consideration of this *Strickland* claim permitted.  Her lengthy counseled reply brief does not respond to Respondents' assertion of procedural default with any attempt to establish either of these excuses.  *Cf.* Resp. at 21-24 (section of Respondents' answer asserting that Petitioner offered no grounds for excusing her defaults).  As we see no independent basis to excuse her procedural default of this claim, we believe it is appropriately dismissed.

> ### 8.     Claim of due process violation regarding exclusion of Gribble's confession

The final basis upon which O'Donnell seeks federal habeas relief is her claim that the trial court erred when it allegedly refused to consider, as exculpatory evidence in the case against her, the confession of her co-defendant, Gribble, in which he stated that he acted alone in killing the victim, striking Eleftheriou in a fit of jealous rage after returning home and seeing him groping O'Donnell

on the couch in the living room of the apartment where they kept a room in the basement.  As support for her contention that the trial court improperly limited the evidence in her case, she points to the court's comment during closing arguments that each defendant's confession could only be used against the defendant who gave it.   (Pet'r Br. at 95, 97; *see* N.T. 6/30/93 at 509-10.)  She alleges that this violated her Sixth and Fourteenth Amendment rights to present favorable witnesses, citing to *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006), and other federal authorities.  (*Id.* at 95-96.)  Respondents contend that this claim is defaulted because it was waived when no objection to this trial court statement was made at the time of trial.  Alternatively, Respondents characterize the claim as one of trial court error, and not a due process violation, and contend that such a claim is not cognizable on federal habeas review.  Also in the alternative, they suggest that the claim is not cognizable because it is a question of how much weight the factfinder gave this evidence, which is a matter of state law and subject to the discretion of the factfinder.  Finally they assert that the state court properly found it to have no merit.  (Resp. at 20-21, 91-96.)  Petitioner's counseled reply brief does not respond to this assertion of procedural default of this claim nor to the substance of Respondents' argument.

O'Donnell presented this issue on direct appeal to the Pennsylvania Supreme Court, when she was represented by Dunham.  The court explained its analysis of this issue as follows:

> Appellant next asserts that she is entitled to a new trial because the court refused to consider her co-defendant's admission that he, and not Appellant, committed the murder of Mr. Eleftheriou.
> …
>
> At trial, the Commonwealth introduced into evidence statements made by Appellant and Gribble. In his statement, Gribble claimed that he had killed Mr. Eleftheriou when he came home and saw him fondling Appellant.  In closing, Appellant's trial counsel

argued that Gribble's statement was an accurate rendition of the murder.  The trial court, however, told counsel that he could "only use the statements against the respective party."  N.T. at 509-10.  Although there was no objection to the trial court's statement at trial, Appellant now argues that she is entitled to a new trial since the trial court's refusal to consider relevant evidence of Appellant's innocence violated her right to present favorable evidence in accordance with her due process rights.  We disagree.

In the first instance, Appellant's argument ignores that she herself tried to take sole responsibility for the murder in her own voluntary statement to the police.  The trial judge, sitting as the fact-finder, had no obligation to disregard the substance of Appellant's confession, which was properly admitted into evidence, when determining Appellant's guilt. Moreover, this claim, contrary to Appellant's argument, does not involve any evidentiary errors in failing to admit exculpatory evidence into trial.[FN8]   Both statements, including Gribble's statement which asserted that he killed Mr. Eleftheriou, were admitted at trial.  The trial court, sitting as fact-finder, was free to afford whatever weight it deemed appropriate to the evidence admitted at trial, including each of the confessions.  *See Commonwealth v. Roberts*, 496 Pa. 428, 434, 437 A.2d 948, 951 (1981) (it is the province of the fact-finder to determine the weight to be assigned to evidence admitted at trial); *Commonwealth v. Yost*, 478 Pa. 327, 332, 386 A.2d 956, 958 (1978) (fact-finder is free to believe all, part or none of the evidence).  Accordingly, this claim fails.

[FN8.  Appellant cites *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), *Commonwealth v. Bracero*, 515 Pa. 355, 528 A.2d 936 (1987) and *Commonwealth v. Hackett*, 225 Pa.Super. 22, 307 A.2d 334 (1973) to support her contention that the trial judge's statement regarding his consideration of Gribble's statement in determining her guilt violated her right to present favorable evidence.  Each of these cases, however, addresses the admissibility of, and not the weight to be assigned to, particular evidence.  *See Washington v. Texas, supra* (defendant has right to offer testimony of witnesses to establish a defense and truth is more easily ascertained when court allows relevant testimony to be admitted, leaving the weight of such testimony to be determined by fact-finder); *Bracero, supra* (trial court did not err in excluding certain exculpatory evidence, namely, statement by declarant allegedly confessing to the burglary which defendant had been

charged with, offered by defendant at trial); *Hackett, supra* (trial court erred in refusing to admit exculpatory statements into evidence).]

 Further, even if we were to find that the trial court's failure to consider Gribble's statement in determining Appellant's guilt constituted error, such error would clearly be harmless. Given Appellant's confession to police, her admissions made to Agnes McClinchey, the physical evidence uncovered by the police, and the testimony of the medical examiner, the evidence of Appellant's guilt was clearly overwhelming. Accordingly, we are convinced that any error potentially arising from the trial court's statement regarding the applicability of Gribble's confession to the consideration of Appellant's guilt would not have altered the verdict, and thus, was harmless. *See Commonwealth v. Story*, 476 Pa. 391, 412, 383 A.2d 155, 166 (1978) (error is harmless where appellate court determines that error did not contribute to the verdict).

*Commonwealth v. O'Donnell*, 740 A.2d 198, 208-09 (Pa. 1999) [Resp't Ex. G].

We do not view the trial court's comment during the closing argument as reflecting an improper limitation on her ability to present favorable evidence but rather a recognition of the constraints of *Bruton v. United States*, 391 U.S. 123 (1968). Moreover, even if the trial court could be deemed to have instructed itself, as fact-finder in this waiver trial, not to consider in the guilt phase of O'Donnell's case any favorable content from Gribble's confession, we would find this error to have been harmless. While Gribble's confession read in isolation appears favorable to O'Donnell, in reality it only further demonstrated the conspiracy of both Gribble and O'Donnell to obscure an explanation for a killing that a large body of evidence suggested was their joint and premeditated effort. Both defense counsel at trial offered a theory that Gribble alone killed Eleftheriou but while acting in the heat of passion. Yet the notion that Gribble alone was responsible for the attack upon Eleftheriou and his dismemberment required the fact-finder to deem it only coincidental that Eleftheriou was in the Richmond Street living room during a time that McClinchey was out of town,

that the hammer just happened to be in the living room although it is usually kept in the basement, and that both he and O'Donnell did not form the intention to take and use Eleftheriou's car and credit card until after he perished. Regardless of the manner in which Judge Ribner did or did not consider in O'Donnell's case the confession given by Gribble, the Pennsylvania Supreme Court was not unreasonable in concluding that this would not have had a substantial and injurious affect upon the outcome *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). As the state court did not unreasonably apply any United States Supreme Court authority concerning a Constitutional right to present favorable evidence at trial, habeas relief should not be granted as to this claim.

## IV.   CONCLUSION

As we have set out above, it is our conclusion that the state courts did not deny relief pursuant to an unreasonable application of any United States Supreme Court authorities when, in 1999 and 2008, they adjudicated seven of the claims that O'Donnell raises in this petition. In addition, her claim of cumulative ineffectiveness of trial counsel cannot provide relief because she failed to present that claim to the Pennsylvania Supreme Court on direct review and has offered no basis for her procedural default to be excused. We do not find that an evidentiary hearing would enable her to cure the defects identified as to the various claims addressed above nor that she meets the standards set out at 28 U.S.C. § 2254(e)(2) for a petitioner who failed to develop a factual basis for her claim in state court. Accordingly, we believe that both Petitioner's request for an evidentiary hearing and her petition for habeas relief should be denied.

Pursuant to Local Appellate Rule 22.2 of the Rules of the United States Court of Appeals for the Third Circuit, at the time a final order denying a habeas petition is issued, the district judge is required to make a determination as to whether a certificate of appealability ("COA") should issue.

Under 28 U.S.C. § 2253(c), a habeas court may not issue a COA unless "the applicant has made a substantial showing of the denial of a constitutional right."  When a federal court denies a habeas petition on procedural grounds without reaching the underlying constitutional claims, a COA may not issue unless the prisoner demonstrates that jurists of reason would find debatable both: (1) whether the petition states a valid claim for the denial of a constitutional right; and (2) whether the district court's procedural ruling was correct.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further."  *Id.*

Here, for the reasons set forth above, we do not believe a reasonable jurist would find the Court to have erred in denying the present petition or to have ruled incorrectly as to the procedural issues barring relief as to particular claims.  Accordingly, we do not believe a COA should issue.

Our Recommendation follows.

## <u>RECOMMENDATION</u>

**AND NOW**, this 31st day of January, 2012, it is respectfully **RECOMMENDED** that the petition for a writ of habeas corpus be **DENIED.** It is **FURTHER RECOMMENDED** that a certificate of appealability should **NOT ISSUE**, as we do not believe that Petitioner has made a substantial showing of the denial of a constitutional right or that reasonable jurists would find the correctness of the procedural aspects of this Recommendation debatable.

Petitioner may file objections to this Report and Recommendation. *See* Local Civ. Rule 72.1. Failure to file timely objections may constitute a waiver of any appellate rights.


BY THE COURT:


  /s/ David R. Strawbridge
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE